**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JULIE CAMPOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-02777 |
| | ) | |
| CITY OF CHICAGO, ERIC TAYLOR, | ) | |
| and TREACHER HOWARD, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Julie Campos, by and through her undersigned counsel, as her Complaint against Defendants City of Chicago and Chicago Police Department ("CPD") Officers Eric Taylor and Treacher Howard (collectively, the "Defendants"), states as follows:

## INTRODUCTION

1. On June 2, 2020—eight days after police murdered George Floyd—Ms. Campos was at work on the South Side of Chicago cleaning up recent property damage, when she was assaulted, humiliated, and arrested by CPD Officer Eric Taylor for a crime she did not commit. At the time, Ms. Campos was just 19 years old.

2. Targeted for documenting police misconduct—as is her First Amendment right—Ms. Campos was not only falsely arrested but also detained and separated from her infant son for hours, in violation of her Fourth Amendment rights.

3. At the same time that numerous CPD officers used excessive force against scores of Chicagoans who protested police violence in the wake of George Floyd's murder, Defendant Taylor cruelly escalated tensions and needlessly instigated conflict outside of protest events.

4. And Defendant Taylor did not act alone. His partner, Officer Treacher Howard, facilitated and implicitly condoned his unlawful acts against Ms. Campos. Defendant Taylor's malicious conduct, and Defendant Howard's assistance and failure to intervene, are the antithesis of public safety and effective policing.

5. Defendants Taylor and Howard (the "Defendant Officers") not only falsely arrested and detained Ms. Campos but also fabricated information in their police reports to cover up the false arrest—a widespread practice CPD officers use to conceal misconduct.

6. The constitutional violations committed by the Defendant Officers are the direct result of the City of Chicago's (the "City") systemic and ongoing failure to ensure safe and constitutional policing. In particular, Defendant Officers' misconduct is the consequence of the City's longstanding failure to adequately train, supervise, and discipline CPD officers and its failure to implement basic policies setting forth minimum constitutional protections. The City was and continues to be deliberately indifferent to the harm that its lack of policy, training, supervision, and discipline causes Chicagoans like Ms. Campos, whose lives are upended by unconstitutional and ineffective policing.

7. Ms. Campos's false arrest occurred in the South Side neighborhood of Grand Crossing—one of many predominantly Black or Latinx Chicago communities whose residents are frequently and disproportionately subjected to abuse and trauma at the hands of CPD officers.

8. The Defendant Officers' misconduct and the City's policies and practices (or lack thereof) caused Ms. Campos significant harm, including the violation of her constitutional rights as well as mental and emotional injuries.

9.     Even though the Defendant Officers' misconduct was captured on multiple CPD officers' body-worn cameras and was witnessed by several CPD officers, Defendant Officers have not faced any disciplinary consequences for their actions.

10.     Ms. Campos brings this civil rights suit to obtain accountability and redress for Defendants' misconduct and the injuries she suffered as a result.

## JURISDICTION AND VENUE

11.     Ms. Campos brings this action pursuant to 42 U.S.C. § 1983 and the First and Fourth Amendments to the United States Constitution. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Campos's claims occurred in the Northern District of Illinois.

## PARTIES

13.     Plaintiff Julie Campos is a 21-year-old Latina resident of Chicago, Illinois.

14.     Defendant Eric Taylor (badge #6191) is a 55-year-old employee of the City of Chicago and a sworn officer of CPD. Defendant Taylor has been a CPD officer since 2000. At all times relevant to this action, Defendant Taylor was acting under color of state law and within the scope of his employment with CPD. Defendant Taylor is sued in his individual capacity for violating Ms. Campos's rights under the U.S. Constitution.

15.     Defendant Treacher Howard (badge #7205) is a 50-year-old employee of the City of Chicago and a sworn officer of CPD. Defendant Howard has been a CPD officer since 1999. At all times relevant to this action, Defendant Howard was acting under color of state law and within

the scope of her employment with CPD. Defendant Howard is sued in her individual capacity for violating Ms. Campos's rights under the U.S. Constitution.

16.     Defendant City of Chicago is a municipal corporation, as defined in the Illinois Municipal Code, 65 ILCS 5/1-1-2(1). The City is organized into various departments, including CPD. The City operates, manages, directs, controls, and is responsible for CPD, which is the City's primary law enforcement agency. CPD acts as the City's agent in the area of municipal law enforcement. At all times relevant to this action, the City was the employer and principal of the Defendant Officers.

## FACTS

### I.     Background

17.     Ms. Campos is a young Latina mother with no criminal record or prior experience with the police before the events of this Complaint.

18.     In the summer of 2020, Ms. Campos was 19 years old and had a one-year-old son. She lived in the Grand Crossing neighborhood on the South Side of Chicago.

19.     At the time, Ms. Campos lived in a transitional housing program for young people experiencing homelessness.

20.     An active member of her community, Ms. Campos volunteered as a Youth Leader with The Night Ministry, a Chicago-based organization that works to provide housing and other resources to individuals struggling with poverty or homelessness.

21.     On May 23, 2020, Ms. Campos began working as a cashier at a Family Dollar store in Grand Crossing, located at 501 E. 79th Street.

22.     The cashier position at Family Dollar was Ms. Campos's first job. She was looking forward to gaining work experience, making a living, securing permanent housing, and supporting her infant son.

23.     But less than two weeks after her employment at Family Dollar began, Ms. Campos's workplace became the scene of her assault, humiliation, and false arrest by Defendant Officers.

## II.     The Events Of June 2, 2020.

### A.     Events Leading To Ms. Campos's False Arrest And Detention.

24.     In late May and early June 2020, in the wake of the murder of George Floyd in Minneapolis, historic protests against police violence and mass incarceration erupted across Chicago. During this period of uprising, some people took advantage of the protests to commit acts of property damage.

25.     Like many stores in Grand Crossing, the Family Dollar where Ms. Campos worked was heavily damaged.

26.     When Ms. Campos arrived at the Family Dollar on the morning of June 2, 2020, she and her coworkers found the store in utter disarray. Many of the store's shelves and display racks were broken. The floors were littered with merchandise, broken shelving, empty boxes, and other debris.

27.     The store manager instructed Ms. Campos and the ten or so other employees who were present to spend the day cleaning up the extensive debris and restoring the premises. Each employee was assigned an aisle to clean.

28.     Ms. Campos diligently cleared trash from her assigned aisle. Throughout the morning, she made trips to carry collapsed cardboard boxes and other garbage to the dumpster that

was located in the store's parking lot next to the store's back door. That door was propped open so that employees like Ms. Campos could easily carry trash to the dumpster.

29.     Around 11:40 a.m., for reasons that are not clear, Defendant Officers arrived at the Family Dollar in their squad car. When they arrived, Family Dollar employees were working to clean the store. Nearly all the individuals on the premises were Family Dollar employees and, like Ms. Campos, they were wearing solid-colored, bright red t-shirts—the easily recognizable Family Dollar work uniform.

30.     Defendant Howard was talking with some of the Family Dollar employees in the parking lot when Defendant Taylor began to berate one of the store's assistant managers (the "Assistant Manager") who was upset with Defendant Officers' presence at the store and repeatedly requested a CPD supervisor.

31.     Defendant Taylor quickly grew extremely aggressive toward the Assistant Manager, who continued to request a CPD supervisor.

32.     Defendant Taylor affirmatively and needlessly escalated the situation.

33.     Defendant Taylor ran up to the Assistant Manager and screamed at him, using vulgar, racist, misogynistic, and sexual epithets.

34.     Among other things, Defendant Taylor yelled at the Assistant Manager: "Yo mama a ho, you bitch ass n**ger!" and "Yo mama sucked my dick last night!"

35.     While screaming profanities at the Assistant Manager, Defendant Taylor also repeatedly taunted him to "make a threat"—expressly trying to provoke the young man to threaten a police officer.

36.     Ms. Campos and other employees who were inside the store heard yelling coming from the parking lot and went out to see what was causing the commotion.

37.     When Ms. Campos saw Defendant Taylor arguing with the Assistant Manager, she took out her cell phone and began filming the interaction on her cell phone camera. Ms. Campos decided to record Defendant Taylor because she was aware of the importance of bystander video footage in exposing police misconduct.

38.     After Defendant Taylor and the Assistant Manager argued for a couple of minutes, the Assistant Manager and the other employees, including Ms. Campos, went back inside the store and resumed cleaning. As Ms. Campos walked back into the store, she saw Defendant Officers heading to their squad car in the parking lot. She presumed the police were leaving and the chaos was over.

39.     Over the next several minutes, Ms. Campos resumed making trips through the open back door to carry collapsed boxes to the dumpster in the parking lot.

40.     Meanwhile, Defendant Officers waited in the parking lot near their squad car for backup to arrive, which Defendant Taylor had requested.

41.     Defendant Officers could see Ms. Campos making trips through the back door to throw collapsed boxes into the dumpster.

**B.      Defendant Taylor Assaults Ms. Campos.**

42.     Once additional squad cars arrived, Defendant Taylor stormed toward the back door of the store.

43.     As Defendant Taylor approached the open door, Ms. Campos happened to be standing in the doorway—her arms full with collapsed cardboard boxes—on her way to the dumpster. Glimpsing the large, aggressive officer coming toward her, Ms. Campos momentarily froze. She was startled and confused, as is clear from Defendant Officers' body-worn camera footage.

44.     Ms. Campos did not know why Defendant Taylor was coming toward her.

7

45. Defendant Taylor said "step back, step back" and grabbed Ms. Campos, forcibly pushing her out of the doorway, and striking her in the face.

46. As would have been obvious to any reasonable officer in Defendant Taylor's position, Ms. Campos had no idea why he was trying to enter the store. She had no idea that he was looking to make an arrest, much less that he was looking to arrest the Assistant Manager.

47. Before grabbing and pushing Ms. Campos, Defendant Taylor never informed her that he was trying to effect an arrest or carry out any other law enforcement function. He never told her why he was trying to enter the store. Nor did Defendant Taylor even give Ms. Campos a moment to process or react to his presence in the doorway. He gave her no meaningful opportunity to voluntarily step aside. Instead, he immediately used force to grab and push her out of the doorway—less than one second after he first said "step back."

48. When Defendant Taylor pushed and struck Ms. Campos, she did not resist in any manner. She fell away from the doorway due to his use of physical force against her, and Defendant Taylor immediately began walking into the store.

49. The entire encounter between Ms. Campos and Defendant Taylor in the doorway lasted no more than a couple of seconds.

50. Defendant Howard was directly behind Defendant Taylor when he confronted Ms. Campos and pushed and struck her in the doorway. Defendant Howard was able to see and hear the entire interaction.

51. Defendant Howard then followed Defendant Taylor into the store, as did at least three other CPD officers.

**C.** **Defendant Officers Falsely Arrest Ms. Campos.**

52. After Defendant Officers walked into the store, Ms. Campos took out her cell phone and began openly recording Defendant Taylor while livestreaming via Facebook Live.

53. Ms. Campos was frightened and distressed by Defendant Taylor's unwarranted use of force but maintained the presence of mind to narrate her livestream video in real-time. "This police officer just punched me in the face!" Ms. Campos exclaimed while pointing at Defendant Taylor and emphasizing, "That one, right there." Ms. Campos criticized Defendant Taylor's use of force repeatedly and loudly. Defendant Officers stood just a few feet away from Ms. Campos, as did the other CPD officers who had arrived.

54. Ms. Campos's verbal complaints and video recording did not hinder or interfere with any officers' law-enforcement duties.

55. Agitated by her criticism, Defendant Taylor pointed to Ms. Campos and her raised cell phone and argued with her about her assertion that he punched her in the face.

56. Ms. Campos started to cry but continued filming Defendant Taylor as he walked around the front of the store looking for the Assistant Manager.

57. Defendant Taylor could see that Ms. Campos was holding up her cell phone to record him.

58. About one minute after Ms. Campos began recording, Defendant Taylor stopped looking for the Assistant Manager and instead marched toward Ms. Campos.

59. With her cell phone camera trained on Defendant Taylor, he pointed to Ms. Campos and shouted: "[Y]ou know what . . . she's going for obstruction."

60. Ms. Campos was openly recording Defendant Taylor when he grabbed her arms—in particular, the arm that was holding the cell phone—forcibly placed her arms behind her back, and placed her wrists into handcuffs, forcing her to hand her phone to a nearby coworker because she could no longer physically hold her phone.

61.     By placing Ms. Campos under arrest, Defendant Taylor directly halted her ability to record him.

62.     Terrified, Ms. Campos grew more distressed and repeatedly asked Defendant Taylor to explain why he was arresting her.

63.      As Defendant Taylor handcuffed Ms. Campos, Family Dollar employees gathered around and loudly, persistently objected to Ms. Campos's arrest. One employee shouted: "Let her go! She did nothing to him [Defendant Taylor]! Let her go! Let her go! Let her go! She did nothing to him! Why is he arresting her? He pushed *her*! Why is he arresting her?" A second employee repeatedly stated: "He [Defendant Taylor] pushed her—hit her in the face." Yet another employee explained to Defendant Officers that Ms. Campos "was just cleaning up."

64.     Defendant Officers ignored the bystanders' pleas not to arrest Ms. Campos.

65.     Defendant Howard was near Defendant Taylor throughout all of the events in the Family Dollar.

66.     Defendant Howard was directly next to Defendant Taylor as he arrested Ms. Campos.

67.     Yet despite having multiple opportunities to intervene, Defendant Howard took no action to prevent or stop Defendant Taylor from baselessly arresting Ms. Campos.

68.     On the contrary, Defendant Howard directly participated in and facilitated Ms. Campos's arrest.

69.     For example, Defendant Howard held back the store employees who crowded around Ms. Campos as she was being arrested and objected that her arrest was baseless.

70.     Defendant Howard also assisted Defendant Taylor in walking Ms. Campos out of the store in handcuffs and conducted a search of Ms. Campos.

10

71.     Both Defendant Taylor *and* Defendant Howard are listed as "Arresting Officer(s)" on the CPD arrest report for Ms. Campos's arrest.

72.     As Defendant Officers led Ms. Campos out of the Family Dollar in handcuffs, Ms. Campos explained that she had done nothing to warrant arrest.

73.     Defendant Taylor told Ms. Campos that she was under arrest "for obstruction."

74.     Defendant Taylor falsely stated that Ms. Campos had "jump[ed] in front of [him]" as he was "trying to effect an arrest." Ms. Campos immediately corrected Defendant Taylor's false assertion, stating that she was simply trying to throw away boxes when Defendant Taylor punched her in the face.

75.     Defendant Officers walked Ms. Campos out of the store and across the parking lot in handcuffs—humiliating her in front of a dozen or so of her coworkers—and placed her into the back of their squad car.

76.     After starting to drive away with Ms. Campos in the back seat, Defendant Taylor stopped the car, jumped out of the driver's seat, and yelled at several Family Dollar employees who continued to protest Ms. Campos's arrest.

77.     Defendant Howard quickly followed Defendant Taylor out of the squad car, instructed him to get back into the car, and ordered him not to get out again.

78.     Defendant Howard told Defendant Taylor: "You['ve] got to calm down."

**D.     Defendant Officers Unlawfully Detain Ms. Campos.**

79.     Defendant Officers drove Ms. Campos to the CPD District 6 station and lockup located at 7808 S. Halsted Street.

80.     Ms. Campos was detained there until about 4:45 p.m.

81.     In total, Ms. Campos was detained for approximately five hours from the time she was arrested.

11

82.     Defendant Officers were both physically present near Ms. Campos for the majority of her detention.

83.     At no point during her arrest or detention did Defendant Officers or any other CPD officers give Ms. Campos *Miranda* warnings.

84.     Ms. Campos's hours-long detention was needlessly and unreasonably long and punitive.

85.     The administrative process of booking Ms. Campos (*e.g.*, taking her fingerprints and photograph) was completed within a matter of minutes.

86.     Yet Ms. Campos was detained for approximately five hours—including nearly two hours *after* her fingerprints and photograph were taken.

87.     Ms. Campos's prolonged detention served no reasonable purpose.

88.     Defendant Officers facilitated, condoned, and/or turned a blind eye to Ms. Campos's unconstitutional detention by, among other things, refusing to release her from custody immediately after all booking procedures were completed and by failing to ensure that she was detained for only the minimally necessary period of time to complete those procedures.

### 1.     Defendant Officers Subjected Ms. Campos To Punitive Treatment.

89.     Throughout her detention, Defendant Officers subjected Ms. Campos to punitive treatment designed to exacerbate the pain, humiliation, and anxiety inherent in being arrested and detained.

90.     Defendant Officers kept her shackled for nearly five hours even though they knew that Ms. Campos—a 19-year-old woman—posed no threat or risk of harm, had never before been arrested, and was under arrest for a non-violent misdemeanor offense (resisting or obstructing a police officer).

91.     Neither Defendant Taylor nor Defendant Howard ever offered Ms. Campos any food or water. Nor did they ever allow her to use the restroom.

92.     For hours, Ms. Campos was unable to inform any family or friends of her whereabouts.

93.     Soon after being arrested, Ms. Campos repeatedly told Defendant Officers that her son (who was one year old at the time) was at daycare, and that she needed to pick him up or make other arrangements for him to be picked up.

94.     Defendant Officers did nothing to help Ms. Campos contact her son's daycare.

95.     Instead, Defendant Taylor taunted Ms. Campos for being unable to call the daycare because she did not have her cell phone (with her saved contacts) and did not know the daycare's phone number by heart. (As described above, Ms. Campos handed her cell phone to a nearby coworker when Defendant Taylor placed her wrists in handcuffs, as she could no longer physically hold her phone.)

96.     Unable to call her son's daycare, Ms. Campos spent hours in custody not knowing where her one-year-old was (*e.g.*, whether someone had picked him up), whether he was safe, or when she would see him again.

97.     Ms. Campos grew increasingly distressed and, at several points, began to cry.

98.     Defendant Officers turned a needlessly long detention into a form of agonizing punishment.

99.     Defendant Taylor also terrorized Ms. Campos in other ways. He intentionally and maliciously prolonged her detention by berating her with demeaning and intimidating remarks.

100.    For example, Defendant Taylor told Ms. Campos that he was going to call Family Dollar's corporate office and get her fired.

13

101.     Ms. Campos took Defendant Taylor at his word. She believed she was going to be fired from Family Dollar, thus losing what was not only her very first job, but also a job on which she depended to provide for her infant son.

102.     Defendant Taylor also told Ms. Campos that he was going to have her transferred to the "women's facility" and refused to tell her when she would be released.

103.     Again, Ms. Campos believed Defendant Taylor. She was terrified that she would be sent to a remote jail or prison—unable to see her baby indefinitely.

104.     When Ms. Campos asked Defendant Howard when she would be released from custody, Defendant Howard also told her that it would depend on whether she would be transferred to the "women's facility," which, according to Defendant Howard, could result in several nights of continued detention.

105.     Ms. Campos was terrified that she would be transferred to a distant jail or prison without having any chance to ensure her son's safety or inform her loved ones of her whereabouts.

106.     Defendant Taylor also used Ms. Campos's prolonged detention to intentionally humiliate her in front of other CPD officers. When an officer would walk by Ms. Campos, Defendant Taylor would mock her in front of the officer and announce, in taunting and shaming tones, that Ms. Campos had obstructed him. Defendant Taylor continued this behavior—which appeared to be a game to him—throughout her detention.

### 2.     Defendant Officers Unlawfully Interrogated Ms. Campos, Including About Her First Amendment-Protected Speech.

107.     Despite never providing Ms. Campos with *Miranda* warnings, Defendant Officers interrogated Ms. Campos while she was in custody.

108.     During their questioning, Ms. Campos repeatedly explained to Defendant Officers that she did not intend to interfere with Defendant Taylor's attempt to arrest the Assistant Manager.

Specifically, Ms. Campos told Defendant Taylor that, when he approached her in the doorway, she did not know he was attempting to arrest the Assistant Manager. In response, Defendant Taylor stated that "it doesn't matter" that Ms. Campos did not know he was attempting to make an arrest.

109.     Many of Defendant Taylor's questions to Ms. Campos focused on her First Amendment-protected speech.

110.     In particular, Defendant Taylor repeatedly questioned Ms. Campos about her statements that he punched her.

111.     Defendant Taylor argued with Ms. Campos about her accusation that he punched her.

112.     Defendant Taylor was upset with Ms. Campos for making the accusation.

113.     Defendant Taylor specifically criticized Ms. Campos for making the accusation in front of the "crowd" at the Family Dollar store.

**E.     Ms. Campos's Arrest For Resisting Or Obstructing A Police Officer Lacked Probable Cause.**

114.     Defendant Officers charged Ms. Campos with resisting or obstructing a police officer, in violation of 720 ILCS 5/31-1(a) ("Section 31-1(a)"). This offense is a Class A misdemeanor.

115.     Ms. Campos was released from detention on a personal recognizance bond (known as an "I-bond").

116.     In August 2020, the charge against Ms. Campos was "stricken off leave," meaning that the charge was voluntarily dismissed by the Cook County State's Attorneys' Office with leave to reinstate within 160 days. The charge was never reinstated, and the case is deemed dismissed. Ms. Campos was not convicted of the Section 31-1(a) offense or any other offense.

117. A person violates Section 31-1(a) if she "knowingly resists or obstructs the performance . . . of any authorized act" by a police officer. 720 ILCS 5/31-1(a).

118. As described in paragraphs 38–51, no reasonable officer in Defendant Officers' position would have believed that Ms. Campos was "*knowingly*" resisting or obstructing Defendant Taylor's duties when he encountered and assaulted her in the doorway of the Family Dollar. Because she was plainly unaware that Defendant Taylor was seeking to make an arrest, no reasonable officer would have believed that Ms. Campos consciously sought to interfere with Defendant Taylor's pursuit of the Assistant Manager.

119. As explained in paragraph 108, Defendant Taylor *admitted* that he arrested Ms. Campos for obstructing a police officer *regardless* of whether she knew he was attempting to make an arrest.

120. Defendant Taylor intentionally or recklessly disregarded the "knowingly" element of Section 31-1(a).

121. In addition, Ms. Campos did not take any action to physically resist, obstruct, or interfere with Defendant Taylor.

122. She did nothing to be evasive or uncooperative.

123. She did not impede or hinder Defendant Taylor's law enforcement duties.

124. There was no probable cause for Ms. Campos's arrest.

**F.      Defendant Officers Falsified Evidence To Conceal Ms. Campos's False Arrest.**

125. One or both of Defendant Officers wrote false information in their police reports in an effort to manufacture probable cause and cover up Ms. Campos's false arrest.

16

126. For example, the Original Case Incident Report states: "[A]s" Defendant Taylor "began to run behind the [Assistant Manager]," Ms. Campos "blocked the entrance and refused to move when [Defendant Taylor] gave her verbal direction."

127. This is false. As described above, and as shown in multiple officers' body-worn camera videos, Defendant Taylor was not "run[ning] behind" the Assistant Manager when Defendant Taylor encountered Ms. Campos. The Assistant Manager had already entered the Family Dollar minutes before Defendant Taylor began to walk toward the doorway of the store.

128. Nor was Ms. Campos "block[ing]" Defendant Taylor "as" he pursued the Assistant Manager. As the body-worn camera videos show, Ms. Campos was *already* in the doorway en route to the dumpster *before* Defendant Taylor approached the door.

129. Further, as explained in paragraph 47, Ms. Campos did not "refuse[] to move when [Defendant Taylor] gave her verbal direction." Ms. Campos made no comments, movements, or facial expressions to indicate that she was "refus[ing]" to move, as the Original Case Incident Report falsely states.

### III. The City's Policies, Practices, And Customs Directly Caused Defendant Officers' Constitutional Violations.

130. Defendant Officers' violation of Ms. Campos's constitutional rights was directly and proximately caused by the City's long-standing, interrelated failures in policy (and lack thereof), practices, and customs, including the following:

(a) The absence of official policy and training to prevent CPD officers from retaliating against members of the public for exercising their First Amendment right to record police officers;

(b) The failure to train, supervise, and discipline CPD officers to prevent false arrests (*i.e.*, arrests lacking probable cause); and

(c)     The longstanding, persistent, widespread, and pervasive practice of failing to adequately investigate, intervene with, discipline, or otherwise correct CPD officer misconduct—often referred to as CPD's "code of silence"—which is so common and well-settled as to constitute a custom that fairly represents municipal policy.

131.    As detailed below, government investigations, media reports, and lawsuits made obvious that it was necessary for the City to modify the above policies, practices, and customs in order to avoid violating community members' First and Fourth Amendment rights. But the City failed, and continues to fail, to do so.

132.    The City's policies, practices, and customs—including the failure to implement the above policies, practices, training, supervision, and structures of accountability—were the moving force behind the First and Fourth Amendment violations committed against Ms. Campos, and directly and proximately caused her to suffer the injuries and damages set forth below, such that the City is liable for Defendant Officers' constitutional violations.

**A.     Despite A Known Or Obvious Risk Of Constitutional Violations, The City's Lack Of Policies And Training Failed To Prevent Officer Retaliation Against Individuals Recording The Police.**

133.    For years, the City has been on notice that CPD officers violate, and are at risk of violating, people's First Amendment rights by falsely arresting—and using other means to abuse, intimidate, or interfere with—individuals who record CPD officers.

134.    A decade ago, the Seventh Circuit established that recording police officers engaged in their official duties in public is First Amendment-protected conduct. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595, 608 (7th Cir. 2012).

135.    Since then, the City and its officers have been sued in high-profile lawsuits alleging that CPD officers falsely arrest and/or use excessive force against individuals who record CPD officers. *E.g.*, Am. Complaint at ¶ 87, *Protesters in Support of Black Lives v. City of Chicago*, No.

18

20-cv-06851 (N.D. Ill. Sept. 10, 2021), ECF No. 59-1; Complaint at ¶¶ 12, 15, *Lee v. Hunt*, No. 19-cv-01379 (N.D. Ill. Feb. 25, 2019), ECF No. 4.

136.     The federal Consent Decree that the City has been subject to since 2019, which compels the City to make sweeping reforms to a wide array of CPD policies and practices, required CPD to take specific action to protect people's right to record CPD officers. The Consent Decree required CPD to issue a policy making clear that CPD officers must "permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties." Consent Decree at ¶ 58, *Illinois v. City of Chicago*, No. 17-cv-6260 (N.D. Ill. Jan. 31, 2019), ECF No. 703-1. The Consent Decree required CPD to establish this policy within 90 days of the Decree's effective date (March 1, 2019)—making clear that the need for this policy was urgent.

137.     In November 2019, the Independent Monitor (the "Monitor"), who is charged with assessing the City's and CPD's compliance with the Consent Decree, found that the City had failed to establish the required policy. Additionally, the Monitor alerted the City that "[t]his policy is necessary because of some CPD officers' unwillingness to allow community members to photograph or record them in public." The Monitor further warned the City that "some officials in CPD leadership" incorrectly view interference with the public's right to record as a "rare and small problem."

138.     That the Consent Decree required CPD to create an explicit policy protecting the public's right to record shows the City knew of a clear risk that, without the required policy and attendant training, CPD officers would continue to unconstitutionally retaliate against members of the public for recording them. This risk was especially obvious given that the Monitor had informed the City of some CPD officers' "unwillingness" to be recorded and the opinion of some of CPD's leadership that this is merely a "small problem."

139.    Despite knowing of the risk of First Amendment violations, at the time of Ms. Campos's arrest—a full year past the Consent Decree deadline—CPD had failed to issue any policy regarding the public's right to record CPD officers and had failed to provide training on the subject.

140.    *To this day*, the City has failed to issue the Consent Decree's required policy on the public's right to record CPD officers and has failed to provide training on the required policy.

141.    The City left Defendant Taylor to interact with individuals seeking to record the police without imposing any policy, training, supervision, or accountability to govern or guide his behavior during this First Amendment-protected encounter, even though the City had long known of the risk to the First Amendment rights of individuals like Ms. Campos who seek to document police misconduct.

142.    The City's failure to adequately establish policies, train, supervise, and/or discipline Defendant Officers regarding the constitutional prohibition on arresting individuals in retaliation for recording police activity constituted deliberate indifference to Ms. Campos's First Amendment rights.

143.    The City's failure to adequately establish policies, train, supervise, and/or discipline Defendant Officers directly and proximately caused the violation of Ms. Campos's First Amendment rights (as set forth above and below) and her resulting injuries.

**B.      Despite A Known Or Obvious Risk Of Constitutional Violations, The City's Lack Of Training, Supervision, And Discipline Failed To Prevent False Arrests.**

144.    For years, the City has been on notice that CPD officers routinely violate, and are at risk of violating, people's Fourth Amendment rights by conducting false arrests—*i.e.*, arrests that lack probable cause.

20

145.    CPD officers' practice of making false arrests is longstanding, widespread, entrenched, and well known.

146.    A recent investigative report by *The Washington Post* found that the City of Chicago paid $528 million to settle civil rights lawsuits against CPD from 2010 to 2020.[1] Of the $528 million in total settlements, the City paid more than $266 million in cases alleging false arrest. Thus, *nearly half* of all police-misconduct settlements paid by the City in the decade prior to Ms. Campos's arrest were in cases alleging a false arrest.

147.    Similarly, the City's own recent report shows that among all civil rights suits against CPD officers that the City settled or litigated to final judgment in 2020, the "most frequently alleged violation"—in 47% of all cases—was false arrest.[2]

148.    The City was also on notice that CPD officers' practice of conducting false arrests is particularly common with respect to the charge of resisting or obstructing a police officer—the exact offense with which Defendant Officers falsely charged Ms. Campos.

149.    As a 2018 investigation by *The Chicago Reporter* concluded, CPD officers engage in "a troubling pattern" of filing false charges of resisting a police officer against people CPD officers have assaulted.[3] As *The Chicago Reporter* noted, CPD officers often use these so-called "cover charges" as "a way to cover up bad behavior or justify their excessive use of force."

---

[1] *See* Keith L. Alexander et al., *The Hidden Billion-Dollar Cost of Repeated Police Misconduct*, Wash. Post, Mar. 9, 2022, https://www.washingtonpost.com/investigations/interactive/2022/police-misconduct-repeated-settlements/.
[2] *See* City of Chicago Dept. of Law, *City of Chicago's Report on Chicago Police Department 2020 Litigation*, Dec. 2021, at 6 https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/City's%20Report%20on%202020%20Litigation%20(With%20Appendices).pdf
[3] Jonah Newman, *Chicago Police Use 'Cover Charges' To Justify Excessive Force*, The Chicago Reporter, Oct. 23, 2018, https://www.chicagoreporter.com/chicago-police-use-cover-charges-to-justify-excessive-force/ [hereinafter Newman, *Chicago Police Use 'Cover Charges'*].

150.    The widespread practice of CPD officers filing false "cover charges" involves officers filing false information in police reports and sworn criminal complaints to manufacture probable cause that does not in fact exist.

151.    From 2012 to 2016, *The Chicago Reporter* found, CPD "made more than 1,300 arrests . . . where the only charge was resisting arrest," and "[m]ore than half of these cases were ultimately dismissed," indicating the charges may have lacked probable case. Experts found this pattern "concerning," the article noted.

152.    The City was also informed by the U.S. Department of Justice ("DOJ") about CPD officers' practice of filing false allegations that a person resisted a police officer as a "cover charge" to conceal officer misconduct. In DOJ's 2017 report setting forth the findings of its pattern-or-practice investigation of CPD, DOJ found that CPD officers routinely make false or unsubstantiated claims in their police reports that a person "actively resisted" the officer or "attempted to defeat arrest"—and in some instances falsely arrested the person for purportedly resisting the officer—in order to falsely justify the officer's improper use of force against the person.[4]

153.    In addition to the longstanding, widespread, entrenched, and well-known pattern of false arrests and falsified arrest documentation across CPD, the City was also on notice that Defendant Taylor *in particular* was at high risk of conducting a false arrest due to his particularly egregious record of misconduct complaints.

---

[4] U.S. Dep't of Justice, *Investigation of the Chicago Police Department* 32, 79 (2017), https://www.justice.gov/opa/file/925846/download [hereinafter "DOJ Report"].

154.    Throughout his career with CPD, the City has received 28 civilian complaints of misconduct against Defendant Taylor—more civilian complaints than *93% of other officers*.[5] At least five of those complaints involved misconduct by Defendant Taylor during arrests.

155.    The record of complaints against Defendant Taylor show that he has a years-long pattern of inappropriately engaging with members of the public in ways that are hostile, unnecessarily aggressive and escalatory, and involve unjustified uses of force.

156.    Several complaints alleged that Defendant Taylor lashed out and used force against an individual in response to the individual engaging in First Amendment-protected expression, such as criticizing Defendant Taylor's performance of his duties.

157.    The following are illustrative examples of misconduct complaints that the City has received about Defendant Taylor:

(a)    A January 2008 complaint alleged that Defendant Taylor unjustifiably struck an elderly man in the face several times while arresting the man. Defendant Taylor received no discipline for this complaint.

(b)    A May 2009 complaint alleged that Defendant Taylor unjustifiably struck a person with bipolar disorder in the face and head while the person was handcuffed at the hospital. Defendant Taylor received no discipline for this complaint.

(c)    An October 2009 complaint alleged that after the complainant (who had called the police) made a statement critical of Defendant Taylor, Defendant Taylor allegedly grabbed the complainant, threw him against a wall, and called him a "motherfucker." Defendant Taylor received no discipline for this complaint.

---

[5] *Eric Taylor*, Citizens Police Data Project, https://cpdp.co/officer/28258/eric-taylor/ (last visited May 25, 2022). In fact, the Invisible Institute's 93% statistic may underrepresent the egregiousness of Defendant Taylor's record relative to other CPD officers because the Invisible Institute's data does not include the two most recent misconduct complaints against Defendant Taylor.

(d)     A September 2010 complaint alleged that after the complainant (who had called the police) made a comment critical of Defendant Taylor, Defendant Taylor replied "fuck you" and "I can lock your ass up . . . . That's what the fuck I'll do[,]" and pushed the complainant against a wall. Defendant Taylor received a three-day suspension for this complaint.

(e)     A December 2018 complaint alleged that Defendant Taylor unjustifiably grabbed and moved the complainant. Defendant Taylor received no discipline for this complaint.

158.     In addition to the dozens of misconduct complaints against Defendant Taylor, he has been sued in civil rights lawsuits, including a suit alleging false arrest against both Defendant Taylor and the City for which the City paid a monetary settlement. *See, e.g.*, Complaint at 3, *Nicholas v. City of Chicago and Eric Taylor*, No. 06-cv-4443 (N.D. Ill. Aug. 17, 2006), ECF No. 1.

159.     In light of the record of complaints against Defendant Taylor, the City knew or should have known of the risk that, absent corrective and preventative measures, Defendant Taylor might use his police powers to conduct unconstitutional arrests.

160.     Despite knowing of the widespread pattern of false arrests by CPD officers—and knowing specifically of Defendant Taylor's record of misconduct—the City failed to take adequate measures to prevent the recurrence of false arrests, particularly in the context of false charges of resisting or obstructing a police officer.

161.     As *The Chicago Reporter* has documented, the City has done "nothing" "to stem this practice or even to track it."[6] When asked in 2018 whether the City was taking measures to

---

[6] Newman, *Chicago Police Use 'Cover Charges'*.

address the problem of CPD officers filing false "cover charges," then-Mayor Rahm Emanuel's deputy chief of staff for public safety expressly admitted that the City was not taking *any* steps to directly address the issue.[7] Specifically, Walter Katz, deputy chief of staff for public safety to Mayor Emanuel, stated that the City was "focused on reforms that will reduce the use of excessive force, *rather than looking at what he called the 'back end' issue* of the charges that are filed after force is used."[8]

162.　More specifically, the City has failed to adequately train, supervise, and discipline officers to prevent the commission of false arrests.

163.　On information and belief, the City failed to train CPD officers on the requirement of probable cause for arrest, and/or any training CPD provided on probable-cause-to-arrest was inadequate because, among other things, CPD failed to teach the proper legal standards, or failed to sufficiently train all officers, or failed to require that all officers attend sufficiently frequent trainings, or failed to train officers that documenting a *false* basis for probable cause in police reports is prohibited and cannot be used to justify an arrest.

164.　The DOJ Report found that "[o]fficers at all ranks—from new recruits to the Superintendent—agree that CPD's training is inadequate."[9]

165.　For example, in an April 2021 report by the Independent Monitor (assessing the period March 1, 2020 through December 31, 2020), the Monitor found that CPD's Fourth Amendment "lesson plans" failed to adequately train officers on the subjects of "impartial policing," "procedural justice, de-escalation, or community policing."[10]

---

[7] *Id.*
[8] *Id.* (emphasis added).
[9] DOJ Report at 94.
[10] Independent Monitoring Report 3 (Amended) at 150, *Illinois v. City of Chicago*, No. 17-cv-6260 (N.D. Ill. Apr. 8, 2021), ECF No. 942, https://cpdmonitoringteam.com/wp-content/uploads/2021/04/2021 _03_30-Independent-Monitoring-Report-3-amended-filed.pdf.

166. On information and belief, since joining CPD in December 2000, Defendant Taylor has received *no training* dedicated to making probable cause determinations for arrest. Nor has Defendant Taylor received any training related to arresting someone for resisting or obstructing a police officer.

167. The lack of training to prevent false arrests is exacerbated by the City's failure to discipline officers who commit false arrests. According to the Citizens Police Data Project, between 1988 and 2018, members of the public filed nearly 9,000 complaints against CPD officers for false arrest, yet *not a single complaint* resulted in the accused officer being disciplined.[11]

168. With respect to Defendant Taylor specifically, the City also failed to implement adequate discipline. Only one of the five complaints listed above resulted in any discipline. And of his 28 total misconduct complaints, the City only sustained the allegations and disciplined Defendant Taylor six times—suspending him four times (for one day, three days, three days, and two days) and reprimanding him twice.[12]

169. The City also fails to adequately supervise CPD officers' arrest practices. For example, DOJ found that CPD fails to require that "supervisors perform fundamental supervisory tasks," such as directly observing and evaluating "the quality of arrests or uses of force."[13]

170. On information and belief, CPD supervisory officers fail to adequately review and confirm the veracity of the information supporting alleged probable cause that arresting officers include in their documentation related to an arrest, including arrest reports, incident reports, and criminal complaints.

---

[11] *Citizens Police Data Project*, https://data.cpdp.co/data/AQWRny/ (last visited May 25, 2022).
[12] *Eric Taylor*, Citizens Police Data Project, https://cpdp.co/officer/28258/eric-taylor/ (last visited May 25, 2022).
[13] DOJ Report at 107.

171.    Defendant Taylor's long history of misconduct complaints—combined with the City's lack of training, supervision, and discipline—exemplifies the City's systemic failure to identify CPD members like Defendant Taylor who are likely to make unconstitutional arrests and to prevent such arrests from occurring.

172.    The City's failure to adequately train, supervise, and/or discipline Defendant Officers constituted deliberate indifference to Ms. Campos's Fourth Amendment rights.

173.    The City's failure to adequately train, supervise, and/or discipline Defendant Officers directly and proximately caused the violation of Ms. Campos's Fourth Amendment rights (as set forth above and below) and her resulting injuries.

### C.    Despite A Known Or Obvious Risk Of Constitutional Violations, CPD's Code Of Silence Is A Pervasive Custom That Prevents Detection And Correction Of Officer Misconduct.

174.    For years, the City, its leadership, CPD leadership, and individual CPD officers have acknowledged that a "code of silence" exists among CPD officers, ensuring both that they stay silent about other officers' transgressions (as Defendant Howard did) and that they take affirmative efforts to lie and conceal evidence of officer misconduct (as one or both Defendant Officers did). One CPD sergeant told the DOJ: "if someone comes forward as a whistleblower in the Department, they are dead on the street."[14]

175.    Multiple decision-makers of the City have admitted that the CPD has an unwritten policy of a code of silence. For example, in December 2015, then-Mayor Rahm Emanuel said in an interview that "there is no doubt" that there is a code of silence "culture" among CPD officers. In March 2016, former CPD Superintendent Richard Brzeczek said in an interview that there was no question that the CPD's code of silence existed during his tenure in the 1980s through to 2016.

---

[14] DOJ Report at 75.

176.     As the DOJ Report stated: "The Mayor has acknowledged that a 'code of silence' exists within CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."[15] In particular, DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable. The DOJ Report concluded that "CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy."[16]

177.     CPD's code of silence is longstanding, persistent, widespread, and so common and well-settled as to constitute a custom that fairly represents municipal policy. In February 2007 in *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill.), a federal jury found that as of 1994 the CPD maintained a code of silence that facilitated police misconduct.

178.     In November 2012, a federal jury in *Obrycka v. City of Chicago, et al.*, No. 07-cv-2372 (N.D. Ill.), found that the City had a widespread custom or practice of failing to investigate and/or discipline its officers, or a widespread custom or practice of a police code of silence, or both, which was the moving force behind a CPD officer's beating of Obrycka in February 2007.

179.     CPD's code of silence and ineffective system of police oversight were in place when Defendants violated Ms. Campos's constitutional rights.

180.     While various Consent Decree provisions aim to reform the code of silence, the City and CPD have failed to comply with many of these provisions.

181.     From March 1, 2020 through December 31, 2020, the Monitor found that CPD failed to establish policies and practices "to encourage and protect CPD members who report

---

[15] *Id.*
[16] *Id.* at 47.

potential misconduct by other CPD members," as required by the Consent Decree.[17] In addition, as the Monitor found, CPD failed to put in place a policy setting forth the responsibilities of the supervisory CPD officers who are responsible for investigating misconduct complaints against CPD members.[18]

182. In January 2020, then-interim CPD Superintendent Charlie Beck acknowledged that "of course" the code of silence "problem" exists in CPD.[19]

183. Central to the code of silence are the dysfunctional investigative and disciplinary systems for CPD officers accused of misconduct, which the City operated prior to and at the time of Ms. Campos's unconstitutional arrest.

184. As noted above, the City completely failed to discipline CPD officers facing allegations of false arrest. Not a single one of the 9,000 complaints against CPD officers for false arrest between 1988 and 2018 resulted in discipline. Similarly, between 1988 and 2018, *only 1%* of civilian complaints against CPD officers for First Amendment violations resulted in any discipline.[20]

185. The City's failure to eliminate the longstanding and widespread code of silence at work in the City's investigative and disciplinary systems for CPD officers constituted deliberate indifference to Ms. Campos's constitutional rights.

186. The code of silence directly and proximately caused the violation of Ms. Campos's constitutional rights (as set forth above and below) and her resulting injuries.

---

[17] Independent Monitoring Report 3 (Amended) at 555, *Illinois v. City of Chicago*, No. 17-cv-6260 (N.D. Ill. Apr. 8, 2021), ECF No. 942, https://cpdmonitoringteam.com/wp-content/uploads/2021/04/2021 _03_30-Independent-Monitoring-Report-3-amended-filed.pdf.
[18] *Id.* at 612–13.
[19] A.D. Quig, *CPD's Beck: 'Of Course' There's a Code of Silence*, Crain's Chicago Business, Jan. 13, 2020, https://www.chicagobusiness.com/government/cpds-beck-course-theres-code-silence.
[20] Citizens Police Data Project, https://data.cpdp.co/data/bMl6mj/ (last visited May 25, 2022).

187. The violation of Ms. Campos's constitutional rights occurred because CPD members including Defendant Officers know that, due to the code of silence, they can commit violations and escape accountability for their misdeeds.

188. Moreover, Defendant Howard's failure to intervene in Ms. Campos's unlawful arrest and detention was the direct and proximate result of the City's code of silence—a pervasive custom of discouraging CPD officers from intervening against fellow officers' misconduct.

189. Through the City's failure to enact policies and practices to hold officers accountable for committing false and retaliatory arrests in violation of the First and Fourth Amendments, the City has led CPD officers to be confident that such actions are acceptable and will not be reported, challenged, investigated, or disciplined. The code of silence thus encouraged and emboldened Defendant Officers to violate Ms. Campos's rights. By maintaining CPD's code of silence, the City instilled in Defendant Officers the belief that they could act with impunity, thereby giving them implicit permission to unconstitutionally arrest and detain Ms. Campos. CPD's code of silence directly and proximately caused the violation of Ms. Campos's constitutional rights.

## IV. Defendants' Conduct, Policies, Practices, And Customs Violated Ms. Campos's Constitutional Rights And Caused Her Harm.

190. As the direct and proximate result of being unconstitutionally arrested and detained, Ms. Campos incurred actual injury, including but not limited to pain and suffering, mental and emotional distress, anxiety, fear, humiliation, embarrassment, despair, rage, personal indignity, and loss of personal freedom.

191. Ms. Campos continues to suffer from Defendants' misconduct and violation of her constitutional rights.

192. As a result of the foregoing, Ms. Campos has incurred monetary damages proximately caused by Defendants' wrongdoing.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
### False Arrest And Detention In Violation Of The Fourth Amendment
### (Against Defendant Officers In Their Individual Capacities And Defendant City Of Chicago)

193. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

194. As described above, Defendant Officers falsely arrested and detained Ms. Campos without probable cause to believe that she had committed any offense, in violation of her Fourth Amendment rights.

195. Defendant Officers' misconduct was objectively unreasonable and violated Ms. Campos's clearly established federal constitutional rights. No reasonable officer in Defendant Officers' position would have believed that probable cause existed to arrest and detain Ms. Campos.

196. Defendant Officers acted maliciously, willfully, and with evil intent, and/or with reckless or deliberate indifference to Ms. Campos's federally protected rights.

197. Defendant Officers' actions were taken under color of state law and within the scope of their employment.

198. Defendant Officers' actions directly and proximately caused Ms. Campos injury and damages, as more fully set forth above.

199. Defendant City of Chicago is also directly liable for the misconduct and injuries described in this Count because Defendant Officers' misconduct was the result of the City's policies (or lack thereof), practices, and customs, including, among other things:

(a)     the City's inadequate training, as described in paragraphs 160–166;

(b)     the City's inadequate supervision, as described in paragraphs 160–162, 169–171, 174–184; and/or

(c)     the City's inadequate discipline, as described in paragraphs 160–162, 167–168, 174–184.

## COUNT II – 42 U.S.C. § 1983
### Retaliatory Arrest And Detention In Violation Of The First Amendment
### (Against Defendant Eric Taylor In His Individual Capacity And Defendant City Of Chicago)

200.     The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

201.     As described above, Defendant Taylor violated Ms. Campos's First Amendment rights by arresting and detaining her in retaliation for her First Amendment-protected speech and conduct.

202.     Ms. Campos engaged in multiple First Amendment-protected activities, including but not limited to:

(a)     Ms. Campos's verbal complaints about Defendant Taylor's misconduct;

(b)     Ms. Campos's recording of Defendant Taylor's misconduct;

(c)     Ms. Campos's recording of herself making verbal complaints about Defendant Taylor's misconduct;

203.     Defendant Taylor caused Ms. Campos to suffer a deprivation—being arrested and detained for approximately five hours—that is likely to deter First Amendment-protected activity.

204.     Ms. Campos's First Amendment-protected activities, as specified in paragraph 202, were at least a motivating factor for this deprivation. But for Ms. Campos's protected First Amendment activities, Defendant Taylor would not have arrested and detained her.

205.   Defendant Taylor's misconduct was objectively unreasonable and violated Ms. Campos's clearly established federal constitutional rights. No reasonable officer in Defendant Taylor's position would have believed that arresting Ms. Campos in retaliation for her First Amendment-protected activity was constitutionally permissible.

206.   Defendant Taylor acted maliciously, willfully, and with evil intent, and/or with reckless or deliberate indifference to Ms. Campos's federally protected rights.

207.   Defendant Taylor's actions were taken under color of state law and within the scope of his employment.

208.   Defendant Taylor's actions directly and proximately caused Ms. Campos injury and damages, as more fully set forth above.

209.   Defendant City of Chicago is also directly liable for the misconduct and injuries described in this Count because Defendant Taylor's misconduct was the result of the City's policies (or lack thereof), practices, and customs, including, among other things:

(a)   the City's inadequate policies, as described in paragraphs 136–143;

(b)   the City's inadequate training, as described in paragraphs 136–143;

(c)   the City's inadequate supervision, as described in paragraphs 136–143, 174–184; and/or

(d)   the City's inadequate discipline, as described in paragraphs 136–143, 174–184.

## COUNT III – 42 U.S.C. § 1983
### Unlawful Detention In Violation Of The Fourth Amendment
### (Against Defendant Officers In Their Individual Capacities)

210.   The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

211.     As described above, Defendant Officers violated Ms. Campos's Fourth Amendment rights by unreasonably detaining her, including for an unreasonably long period of time.

212.     Defendant Officers' misconduct was objectively unreasonable and violated Ms. Campos's clearly established federal constitutional rights. No reasonable officer in Defendant Officers' position would have believed that the purpose, manner, and duration of Ms. Campos's detention was constitutionally permissible.

213.     Defendant Officers acted maliciously, willfully, and with evil intent, and/or with reckless or deliberate indifference to Ms. Campos's federally protected rights.

214.     Defendant Officers' actions were taken under color of state law and within the scope of their employment.

215.     Defendant Officers' actions directly and proximately caused Ms. Campos injury and damages, as more fully set forth above.

### COUNT IV – 42 U.S.C. § 1983
### Failure To Intervene
### (Against Defendant Treacher Howard In Her Individual Capacity And Defendant City Of Chicago)

216.     The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

217.     As described above, Defendant Howard was aware of all facts material to Ms. Campos's unconstitutional arrest and detention but failed to intervene to prevent or mitigate the violation of Ms. Campos's constitutional rights.

218.     Defendant Howard failed to intervene even though she *(a)* knew, or had reason to know, that Defendant Taylor was violating Ms. Campos's constitutional rights, and *(b)* had a realistic opportunity to intervene to prevent or mitigate those constitutional violations.

219.     Defendant Howard's failure to intervene was objectively unreasonable and violated Ms. Campos's clearly established federal constitutional rights. No reasonable officer in Defendant Howard's position would have believed that failing to intervene was constitutionally permissible.

220.     Defendant Howard acted maliciously, willfully, and with evil intent, and/or with reckless or deliberate indifference to Ms. Campos's federally protected rights.

221.     Defendant Howard's actions (or lack thereof) were taken under color of state law and within the scope of her employment.

222.     Defendant Howard's failure to intervene directly and proximately caused Ms. Campos injury and damages, as more fully set forth above.

223.     Defendant City of Chicago is also directly liable for the misconduct and injuries described in this Count because Defendant Howard's failure to intervene was the result of the City's policies (or lack thereof), practices, and customs, including, among other things:

> (a)     the City's inadequate policies, as described in paragraphs 174–189;

> (b)     the City's inadequate supervision, as described in paragraphs 174–189; and/or

> (c)     the City's inadequate discipline, as described in paragraphs 174–189.

**COUNT V – 745 ILCS 10/9-102**
**Indemnification**
**(Against Defendant City Of Chicago)**

224.     The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

225.     Illinois law provides that local public entities are directed to pay any tort judgment or settlement for compensatory damages for which employees, acting within the scope of their employment, are liable.

226. Defendant Officers are employees and agents of the City of Chicago and were employed by the City of Chicago at all times relevant to this action.

227. At all relevant times, Defendant Officers acted within the scope of their employment in committing the misconduct described herein.

228. The City is therefore liable for any judgment or settlement for compensatory damages that may be entered against Defendant Officers.

## PRAYER FOR RELIEF
### (All Counts)

WHEREFORE, Ms. Campos respectfully requests that the Court enter an order:

a. Granting judgment in favor of Ms. Campos and against Defendants;

b. Awarding Ms. Campos compensatory and punitive damages, in a sum to be determined by the jury at trial;

c. Declaring that Defendants' misconduct as described herein is unlawful;

d. Awarding Ms. Campos attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

e. Awarding Ms. Campos such additional relief, whether in law or in equity, as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Julie Campos hereby demands a trial by jury on all issues so triable.

DATED: May 26, 2022                    Respectfully submitted,


/s/ *Joshua M. Levin*
Joshua M. Levin
Alexandra K. Block
Michelle Teresa García
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
jlevin@aclu-il.org
ablock@aclu-il.org
mgarcia@aclu-il.org

Arturo Hernandez
Patricia Nix-Hodes
LAW PROJECT OF THE CHICAGO COALITION FOR
THE HOMELESS
70 East Lake Street, Suite 720
Chicago, IL 60601
Phone: (312) 641-4140
Fax: (312) 641-4144
arturo@chicagohomeless.org
patricia@chicagohomeless.org

Robert N. Hermes
Andrew D. Shapiro
Katharine H. Walton
PORTER, WRIGHT, MORRIS & ARTHUR LLP
321 North Clark Street, Suite 400
Chicago, Illinois 60654
Phone: (312) 756-8500
Fax: (312) 444-9287
rhermes@porterwright.com
ashapiro@porterwright.com
kwalton@porterwright.com